UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| DENA GIESING,<br><br>        Plaintiff,<br><br>    v.<br><br>SCHINDLER ELEVATOR CORPORATION,<br><br>        Defendant. | Case No. 2:21-cv-4181-NKL |

### ORDER

Defendant Schindler Elevator Corporation moves for summary judgment on Plaintiff Dena Giesing's claim of *res ipsa loquitor* negligence, stemming from her injury on an elevator installed and exclusively maintained by Schindler. *See* Doc. 32. As explained in detail below, because material disputes of fact preclude summary judgment and a reasonable jury could find in Ms. Giesing's favor, Schindler's Motion is DENIED.[1]

### I. BACKGROUND

Ms. Giesing worked as a respiratory therapist at St. Mary's Hospital in Jefferson City, Missouri. On October 13, 2019, Ms. Giesing and a coworker used an elevator at St. Mary's. Ms.

---

[1] It appears Ms. Giesing asks, in her opposition to Schindler's Motion for Summary Judgment, that the Court *sua sponte* grant summary judgment in her favor. The Court will not. As a preliminary matter, Ms. Giesing could have filed a Motion for Summary Judgment by the dispositive motion deadline set by the Court. Even so, while the Court holds that a reasonable jury *could* find in Ms. Giesing's favor under a theory of *res ipsa loquitor* negligence, the evidence does not *compel* a jury to do so. "The making of a submissible case under res ipsa loquitur creates only a permissible, rebuttable inference of negligence. The defendant is not required to introduce evidence to rebut the inference of negligence, and the trier of fact is free to accept or reject the inference, even if the defendant introduces no contrary evidence. The burden of proving liability remains, at all times, with the plaintiff." *State ex rel. GS Technologies Operating Co., Inc. v. Pub. Serv. Com'n of State of Mo.*, 116 S.W.3d 680, 694–95 (Mo. Ct. App. 2003). Summary judgment in Ms. Giesing's favor thus would not be appropriate.

Giesing traveled with her "workstation-on-wheels" cart. When the elevator arrived, Ms. Giesing walked backwards into the elevator, pulling her cart. Ms. Giesing had one hand on each side of the cart, with her left hand inside the elevator close to her body and her right "not more than halfway toward the front of the cart." Doc. 36 (Ms. Giesing's Response to Schindler's Statement of Material Facts), at ¶ 45. While she backed onto the elevator, Ms. Giesing's head was turned to the left as she spoke with her coworker; she was not paying attention to the elevator doors as they closed. However, she felt a sudden and intense pain in her right hand and realized that the elevator door had closed on her cart and her right hand. She then jerked her hand out of the elevator door. Once her cart was removed from the elevator doors, the doors closed and continued to the second floor. After leaving the elevator on the second floor, Ms. Giesing continued her work. However, within an hour, Ms. Giesing sought care at St. Mary's emergency department. Her fifth metacarpal bone (the bone that leads to the pinky finger) on her right hand was fractured.

The Parties dispute how much of the cart—and by extension, Ms. Giesing's right hand—remained outside the elevator when it closed. Ms. Giesing maintains that at least part of her cart remained outside of the elevator when the door closed. *See* Doc. 38, ¶¶ 7–13;[2] Doc. 36-9 (Giesing

---

[2] Schindler objects to Ms. Giesing's Material Fact ¶ 7, which states that part of Ms. Giesing's hand and cart were "on or above the threshold" of Elevator No. 8 when the doors closed. Schindler objects because, by its interpretation of Ms. Giesing's testimony, the record does not support that part of Ms. Giesing's cart was outside the elevator—meaning in the first floor hallway—when the doors closed. However, Ms. Giesing's testimony speaks for itself. She testified "[e]verything else was inside up until that point and then my hand was on the threshold with part of my cart and then part of my cart was outside of the elevator." Doc. 36-9, at 77:7–15. From this testimony, a jury could reasonably conclude that part of Ms. Giesing's cart remained completely outside of the elevator, and therefore in the hallway and necessarily in the light curtain's field of detection. Schindler's interpretation of Ms. Giesing's testimony is not the only reasonable one. This only further highlights a material dispute of fact that precludes summary judgment.

Dep.), at 76:5–77:15, 79:17–21.[3] She further states that part of the cart and her hand were in the elevator's threshold, that is, the portion of the elevator's entrance that is usually covered by the elevator's retracting door. The rest of Ms. Giesing's body had passed the elevator's threshold before the door shut.

Schindler suggests instead that Ms. Giesing and her cart were mostly within the elevator, but that part of her cart and hand were within the "Dead Zone" on the elevator's threshold, a two-inch section in the elevator's doorframe which is not protected by the elevator's WECO light curtain detectors. *See generally* Doc. 36, ¶¶ 13–17. For that to be true, none of Ms. Giesing's cart could have remained outside of the elevator. The light curtain detector has 94 non-parallel beams that span the length of the elevator's doors; if any beam is interrupted, the detectors are designed to reopen the elevator's doors. The two-inch dead zone is a standard part of the elevator's design, and it was consistent with the version of the Missouri Elevator Code in effect on the date of Ms. Giesing's injury. Schindler asserts that it performed appropriate preventative maintenance and that the elevator was functioning properly on the date of Ms. Giesing's injury; Ms. Giesing disputes both claims.

The elevator on which Ms. Giesing was injured is known as Elevator No. 8. Schindler installed Elevator No. 8 at St. Mary's and maintains an exclusive preventative maintenance contract. Per the contract, Schindler agreed to, on a periodic basis "examine, lubricate, adjust, and as needed or if usage mandates, repair, or replace Covered Components" of St. Mary's elevators. *See* Doc. 38, at 8, ¶ 33. Schindler—and only Schindler—had access to the elevator to conduct

---

[3] Ms. Giesing restarted the numbering of her Additional Statement of Material Facts at 1. Therefore, to clearly identify which Statement of Material Facts the Court cites, the Court will, when necessary, include both the relevant ECF page number and paragraph(s) in its citations.

maintenance or repairs. Doc. 38, ¶ 36–37.[4] St. Mary's was specifically required to prevent others from accessing the elevator's components.

The Parties dispute the degree to which Schindler actually maintained Elevator No. 8, but agree that Schindler's technician was at St. Mary's at least four times between December 2016 and February 14, 2019. Schindler had last serviced Elevator No. 8 approximately eight months before Ms. Giesing's injury. Elevator No. 8 is also subject to inspections by the State of Missouri. It was inspected on October 8, 2018—just over a year before Ms. Giesing's injury—and in December of 2019, several months after the injury. Both times, Elevator No. 8 passed inspection and no variations or code violations were identified. Other than Ms. Giesing's injury, there have been no reported instances or allegations of Elevator No. 8 closing on a person or object, or otherwise failing to function in an ordinary manner.

St. Mary's informed Schindler of the injury the day after it occurred, on October 14, 2019. Schindler's technician, Joseph Ammons, arrived the same day and removed Elevator No. 8 from service to begin an inspection. The technician was on site at St. Mary's for approximately an hour, and his inspection included multiple tests of the WECO light curtain door detector. Doc. 36, at 22, ¶¶ 61–62. This included obstructing the elevator's light curtain detectors at multiple heights

---

[4] Schindler disputes Ms. Giesing's Statement of Additional Facts ¶¶ 36 and 37, both which include language from Schindler's contract with St. Mary's to support the proposition that Schindler had an exclusive preventative maintenance contract with St. Mary's. Schindler argues that both paragraphs state legal conclusions to which no response is required. The Court disagrees. Both paragraphs 36 and 37 cite directly to the plain terms of Schindler's contract with St. Mary's. Schindler does not argue that Ms. Giesing misstates the contract. The plain language of the contract states that Schindler "will not permit others to work on the Equipment during the term of this Agreement" and Schindler "will prevent access to the Equipment . . . by anyone other than [Schindler]." *See* Doc. 38, at ¶¶ 36–37. To the extent Schindler disputes that their maintenance contract with St. Mary's is exclusive, it should dispute that fact explicitly. In any event, as discussed below, at minimum, it is a material dispute of fact relevant to Schindler's control over the instrumentalities that caused Ms. Giesing's injury, the second element of Ms. Giesing's r*es ipsa* claim.

and positions in the doorframe, and for various lengths of time, to ensure that the detectors were functioning properly and that the elevator would not override the detector's signal to keep the door open if the obstruction remained for a longer period. *Id.* Mr. Ammons further inspected Elevator No. 8's door operator device; he identified no problems. Furthermore, Mr. Ammons tested the front and rear door torques—the force at which the elevator doors closed—and found both doors to close below the 30-pound limit. *Id.* at 23, ¶ 64. At the conclusion of his inspection, Mr. Ammons checked Elevator No. 8's error log, and does not recall seeing any error. At bottom, he found no evidence that elevator No. 8, or any of its components, had malfunctioned.[5]

---

[5] Also before the Court is Doc. 39 Schindler's Motion to Strike as a sham affidavit Doc. 36-8, the Affidavit of Dena Giesing attached to her Opposition to Schindler's Motion for Summary Judgment. It is DENIED. "It is well-settled that parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." *Button v. Dakota, Minnesota & E. R.R. Corp.*, 963 F.3d 824, 830 (8th Cir. 2020). "An affidavit is a sham affidavit if it contradicts prior testimony or is a 'sudden and unexplained revision of testimony [that] creates an issue of fact where none existed before." *Id.* (internal quotation omitted). However, if the affidavit merely explains portions of a prior deposition that may have been unclear, it is not a sham affidavit." *Id.* at 830 (quoting *City of St. Joseph v. Sw. Bell Tel.*, 439 F.3d 468, 476 (8th Cir. 2006)). As an initial matter, even without considering Ms. Giesing's affidavit, the Court concludes that there are material disputes of fact that preclude summary judgment. Setting this aside, a district court must exercise great care when examining alleged inconsistencies between an affidavit and prior deposition testimony. *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361 (8th Cir. 1983). Schindler argues the affidavit raises two sham issues. First, that part of Ms. Giesing's cart remained outside the elevator—meaning in the hallway—when Elevator No. 8's doors closed and second, that Ms. Giesing's cart had objects hanging from it when she entered Elevator No. 8. As discussed in detail in this Order, Ms. Giesing's deposition testimony supports an inference that part of her cart remained completely outside the elevator, and therefore the Court will not strike the portions of her affidavit that address this issue because there is no contradiction. Ms. Giesing's statements that she had objects hanging from her cart directly contradict her deposition testimony. However, the Court need not strike them because the affidavit does not raise sham issues of material fact. Whether the cart had objects hanging from it does nothing to change Ms. Giesing's testimony that a portion of the cart itself—not any object hanging from it—remained outside the elevator. Schindler may address Ms. Giesing's changing testimony at trial, but it does not raise a new issue relevant to summary judgment. *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) ("Conversely, if the submitted evidence does not create a genuine dispute of material fact, there is no need for the court to separately determine whether it is [admissible] because, even assuming it is not, it will not affect the ultimate summary judgment ruling." (subsequent history omitted)). Schindler also takes issue with the fact that, according to Schindler, Ms. Giesing's

## II. STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R.*, 931 F.3d 664, 669 (8th. Cir. 2019) (quotation marks and citation omitted); Fed. R. Civ. P. 56(a). While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue of material fact for trial." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

### A. *Res Ipsa Loquitor Under Missouri Law*

In Missouri, *res ipsa loquitor* is a rule of evidence, not a cause of action. *Carter v. Skelly Oil Co.*, 363 Mo. 570, 575 (Mo. 1952) ("Generally speaking, the doctrine of res ipsa loquitur has no application to the pleadings . . . Rather is it an inference aiding in the proof."); *see also* John Goldberg et al., *Tort Law: Responsibilities and Redress* 210 (2d ed. 2008). To make a submissible case of *res ipsa* negligence, a plaintiff must establish three elements: "(1) the incident would not

---

affidavit relies on unauthenticated photos that lack foundation. Like Ms. Giesing's statements about objects hanging from her car, these photos do not create a new issue of material fact, and even if they did, the Court finds Ms. Giesing could appropriately authenticate and lay a foundation for their admission. *Schmidt v. City of Bella Villa*, 557 F.3d 564, 569 (8th Cir. 2009) (for a photograph to be admissible it must be "an accurate representation of the thing depicted as it appeared at the relevant time.").

ordinarily occur in the absence of negligence; (2) the incident was caused by an instrumentality under the defendant's control; and (3) the defendant has superior knowledge about the cause of the incident." *Sides v. St. Anthony's Med. Ctr.*, 258 S.W.3d 811, 814 (Mo. banc 2008). The *res ipsa* doctrine "supplies circumstantial evidence of a breach when the plaintiff lacks the facts to plead the specific negligent conduct that constituted the breach. In effect, res ipsa loquitur carries the plaintiff over the breach hurdle." *Martin v. City of Washington*, 848 S.W.2d 487, 495 (Mo. 1993); *see also Niman v. Plaza House, Inc.*, 471 S.W.2d 207, 213 (Mo. 1971) (en banc). However, *res ipsa loquitur* does not relieve a plaintiff of the burden of proving duty, causation, and damages. *See Lopez v. Accu-Screen, Inc.*, 13-04069-CV-NKL, 2013 WL 12155464, at *1 (W.D. Mo. June 19, 2013); *see also Watts v. Sechler*, 140 S.W.3d 232, 241 (Mo. Ct. App. 2004).

The application of *res ipsa* proceeds in two steps. First, the Court determines whether the doctrine should apply in the first instance. Because the first and third elements of *res ipsa* are pure questions of law, the Court, not the jury, must decide them. *See generally Niman v. Plaza House, Inc.*, 471 S.W.2d 207, 212-14 (Mo. banc 1971); *see also* MAI 31.02(3). If the Court determines these elements are met, and that the plaintiff has offered enough evidence from which a reasonable jury could conclude that the defendant controlled, had a right to control, or managed the instrumentality involved, the jury is instructed on the application of *res ipsa*. *See* MAI 31.02(3)

Even if a plaintiff makes a submissible case under a *res ipsa* theory, a jury is not required to accept the inference of negligence that it creates. *Res ipsa* merely creates a permissible, rebuttable inference. *Green v. Plaza in Clayton Condo. Ass'n*, 410 S.W.3d 272, 284 (Mo. Ct. App. 2013) (quoting *State ex rel. GS Technologies Operating Co., Inc. v. Pub. Serv. Comm'n of State of Mo.*, 116 S.W.3d 680, 694–95 (Mo. Ct. App. 2003)). In addition to arguing that *res ipsa* does not apply, a defendant may rebut that presumption in many ways, including by demonstrating that

it acted reasonably or by proving that the plaintiff caused her own injuries. However, a jury may reject the inference of negligence created by *res ipsa* even if a defendant does nothing to rebut it; "[t]he burden of proving liability remains, at all times, with the plaintiff." *Id.*

Schindler argues that Ms. Giesing has failed to present evidence such that a reasonable jury could find for her under any of the three required elements. Accordingly, the Court evaluates each element.

### B. Whether Ms. Giesing's Injury Would Normally Occur Without Negligence

The *res ipsa* doctrine may apply only if "the event [is] an unusual occurrence that ordinarily results from negligence and from which, therefore, negligence [on the part of the defendant] is a reasonable inference." *Weaks v. Rupp*, 966 S.W.2d 387, 394 (Mo. App. Ct. 1998) (citing *City of Kennett*, 564 S.W.2d at 45). "[I]f applicable to a given factual situation or event, [the doctrine] simply means that the happening of the event provides sufficient circumstantial evidence so as to allow, but not compel, the jury to infer from that evidence that the event happened because of the defendant's negligence and to so find." *Akers*, 564 S.W.2d at 45 (Mo. 1978). Judges must apply their common experience in life to the event in question to determine whether it is an unusual occurrence which ordinarily results from negligence. *Id.*

Schindler argues that Ms. Giesing's claim fails on this element because she has failed to exclude the possibility that she was within the "Dead Zone" when the elevator closed, and therefore her injury is not one that normally results from negligence. However, "[a] party seeking to apply the doctrine of res ipsa need not . . . exclude all reasonable hypotheses except defendant's negligence." *Eversole v. Woods Acquisition, Inc.*, 135 S.W.3d 425, 428 (Mo. Ct. App. 2004). All a plaintiff must do is "submit enough facts from which the court could conclude that, more often than not," an elevator door closing on a passenger is caused by "a failure to exercise reasonable

care on the part of the person in charge of" the elevator. *Id.* Schindler insists that the evidence shows that "Ms. Giesing's injury is far more consistent with user error," Doc. 32, at 15. Schindler dismisses Ms. Giesing's account of the events entirely, claiming that Ms. Giesing's testimony that her cart was "outside" the elevator does not equate to testimony that part of Ms. Giesing's cart was in the WECO light curtain's zone of detection. *See* Doc. 38, at 25–26. But these are questions of fact that only the jury can resolve. Therefore, Schindler is not entitled to summary judgment on this point. *See generally Becker v. Ford Motor Co.*, 07-cv-01573, 2010 WL 11582979, at *8 (E.D. Mo. Sept. 24, 2010) (denying summary judgment on *res ipsa* claim when plaintiff and defendant disagreed on the events that led to plaintiff's injury, holding that if "the jury believes [plaintiff's] version of events regarding how the accident occurred, the jury could return a verdict in his favor under a res ipsa loquitur theory.") (internal emphasis omitted). Although both Parties label their version of the events that led to Ms. Giesing's injury as uncontested, it is plain from their briefing that whether Ms. Giesing was in the elevator's "Dead Zone" when the doors closed, or part of her cart remained outside of the elevator entirely, is a genuine and material dispute of fact.

Ms. Giesing testified that at least part of her cart was "outside" the elevator. Drawing all inferences in Ms. Giesing's favor, as the Court must, this testimony is consistent with part of Ms. Giesing's cart protruding into the hallway and therefore necessarily obstructing the elevator's WECO light curtain detector. If that is true, then, according to both Schindler's technician and Schindler's expert witness, the elevator would have had to have malfunctioned in some way to injure Ms. Giesing. Doc. 36-2 (Ammons Dep.), 77:16–78:11; Doc. 36-5 (Donnelly Dep. 80:13–20). While a jury could conclude that Ms. Giesing was in the "Dead Zone," a jury could just as well believe that the elevator malfunctioned, and elevators do not malfunction in such a way absent negligence by the company charged with their maintenance. *See Linwood v. Schindler Elevator*

9

*Corp.*, 16-cv-1020, 2019 WL 5722110, at *10 (S.D.N.Y. Jan. 25, 2019) ("[C]ommon sense establishes that an adequately maintained elevator should not have its doors closing on and striking its passengers severely enough to caus[e] injuries to its passengers.") (internal quotation marks and citation omitted); *see also Stone v. Courtyard Mgmt. Corp.*, 353 F.3d 155, 161 (2d Cir. 2003) (holding that an injury on an elevator, which does not normally cause harm, "suggests a malfunction which in turns suggests neglect . . . . If the injury was not the result of a malfunction attributable to negligence [the defendant] is free to offer evidence to that effect at trial.") (internal quotation marks and citation omitted).[6]

This Court joins numerous others in holding that an elevator's doors do not normally close on a passenger absent negligence. Missouri courts have consistently held that the sudden movement of an elevator satisfies the first element of the *res ipsa* doctrine. *Clark v. Linwood Hotel, Inc.*, 291 S.W.2d 102 (Mo. 1956). The Missouri Supreme Court has extended that well-

---

[6] On reply, Schindler notes that while the court in *Linwood*—another case involving Schindler— denied summary judgment, it ultimately granted a Rule 50 Motion in favor of Schindler at trial. Schindler presents Judge Kaplan's later decision as turning on *res ipsa's* first element, that the door strike injury would not normally occur absent negligence. It did not. Judge Kaplan accepted that the jury could find the plaintiff was struck and suffered some injury, even if he found it unlikely that a jury would believe the plaintiff's account of how the elevator doors closed on her. What matters, Judge Kaplan concluded, is that the jury could believe that the plaintiff was hurt by the elevator, and an "injurious strike . . . doesn't ordinarily happen without somebody's negligence." Doc. 38-4, 329:24–330:3. Judge Kaplan found that the plaintiff had produced no evidence that Schindler's breach, *inferred by the establishment of res ipsa*, caused the plaintiff's injuries. Explicit in Judge Kaplan's analysis was the importance of testimony from Schindler's technician establishing that even if Schindler had negligently maintained any of the relevant elevator's components, that negligent maintenance would have resulted in the elevator's door remaining *open*, not slamming shut on the plaintiff. Accordingly, even with the inference of negligent maintenance, there was no evidence connecting the negligent maintenance to the plaintiff's injury. Here, in contrast, even if Schindler had moved for summary judgment on the issue of causation, rather than simply the application of *res ipsa*, there is enough evidence in the record to create a genuine dispute of fact. Both Schindler's expert and Schindler's technician testified that, if Ms. Giesing's version of her injury were true, there would have had to be a problem with the elevator. Doc. 36-2 (Ammons Dep.), 77:16–78:11; Doc. 36-5 (Donnelly Dep. 80:13–20).

established principle to include any sudden unusual elevator malfunctions "which would not normally occur without negligence of the parties in charge." *Bass v. Nooney Co.*, 646 S.W.2d 765, 768 (Mo. 1983) (applying *res ipsa* to a case of an elevator stalled between floors). While it appears Missouri courts have not yet addressed in a written opinion the application of *res ipsa* to cases in which elevator doors close on or strike a passenger, the Court concludes that Missouri courts would not hesitate to apply *res ipsa* in this scenario.

Doing so is consistent with the law in many other states. *See*, *e.g.*, *Newell v. Westinghouse Elec. Corp.*, 36 F.3d 576, 577 (7th Cir. 1994) (applying Indiana law to hold the *res ipsa* doctrine applicable where elevator doors slammed shut on the plaintiff before she was all the way inside in elevator.); *First Nat'l Bank v. Otis Elevator Co.*, 2 Ariz.App. 80, 406 P.2d 430, 434 (Ariz. 1965) (applying *res ipsa* because "a jury might well believe plaintiff was hit by the elevator door, and . . . elevator doors do not hit people in the absence of someone's negligence"); *Montgomery Elevator Co. v. Gordon*, 619 P.2d 66, 69 (Colo. 1980) (applying *res ipsa* because "[c]ommon sense and experience tell us that elevators do not usually operate in this manner and that, when they do, negligence is a more probable explanation than other causes"); *Burns v. Otis Elevator Co.*, 550 So.2d 21, 22 (Fla. Dist. Ct. App. 1989) (reversing grant of summary judgment in favor of defendant because *res ipsa* applied to case in which elevator doors slammed shut on passenger entering elevator); *see also Landmark Hotel & Casino, Inc. v. Moore,* 104 Nev. 297, 300 (Nev. 1988) (finding that automatic glass doors, which are "ubiquitous" and "afford safe ingress to countless facilities daily," do not normally close on people, suggesting a malfunction attributable to negligence). Schindler has not cited any decision in which an elevator door injury failed to satisfy *res ipsa*'s first element, and this Court will not be the first to do so.

11
Case 2:21-cv-04181-NKL   Document 57   Filed 09/02/22   Page 11 of 19

Schindler argues that these cases, and others cited by Ms. Giesing, are dated, as they were decided before light curtain detectors became widespread. However, no matter the prevalence of light curtain detectors, Schindler does not argue—or present evidence to establish—that "Dead Zones" in light curtain detectors, and accidents because of them, have become so notorious that common sense dictates that door crush injuries should be attributed to them, rather than to negligence. Schindler's own expert testified that lay passengers do not necessarily know how elevator doors function, and that passengers generally think there is a sensor somewhere in the door that keeps it from closing if there is an obstruction. *See* Doc. 36-5, 93:23–94:18. Whether the "Dead Zone," negligence on the part of Schindler, or some other phenomenon caused Ms. Giesing's injury is an issue that only the factfinder can resolve. If a jury accepts Ms. Giesing's version of her injury, common sense would dictate that it is more likely than not that Elevator No. 8's doors closed because of negligence. Accordingly, Defendant's Motion on this point is DENIED.

### C. Whether the Incident Was Caused by an Instrumentality Under Schindler's Control

The second element of a *res ipsa* claim requires a jury to find that the instrumentality causing the plaintiff's injury was under the defendant's management and control at the time a plaintiff was injured. *Green v. The Plaza in Clayton Condo.*, 410 S.W.3d 272, 283–84 (Mo. Ct. App. 2013). The control element exists to establish the defendant, as opposed to some third party, as the negligent actor. *Mahan v. Mo. Pac. R.R. Co.*, 760 S.W.2d 510, 513 (Mo. Ct. App. 1988). "If the plaintiff shows the defendant was in exclusive control of the instrumentality which caused the accident, he has inferentially focused negligence upon defendant." *Mahan v. Mo. Pac. R. Co.*, 760 S.W.2d 510, 513 (Mo. Ct. App. 1988) (citing *McCloskey v. Koplar*, 46 S.W.2d 557, 560 (Mo. banc 1932)); *see also Weaks v. Rupp*, 966 S.W.2d 387, 394 (Mo. App. Ct. 1998). Actual physical

12

Case 2:21-cv-04181-NKL   Document 57   Filed 09/02/22   Page 12 of 19

control is not required; it is enough that the defendant has the *right* to control the instrumentality at the time a plaintiff was injured. *Sirna v. APC Bldg. Corp.*, 730 S.W.2d 561 (Mo. Ct. App. 1987).

Ms. Giesing argues that Schindler had the right to control Elevator No. 8 because Schindler designed[7] and installed the elevator and had an exclusive contract requiring Schindler—and only Schindler—to maintain it. Indeed, St. Mary's was required to prevent anyone else from accessing Elevator No. 8 or its components. Schindler argues that it does not maintain the requisite control because it does not own the elevator, nor did it design it or manufacture any of the component parts—such as the WECO light curtain detection device or the door operator. As such, Schindler argues that Ms. Giesing has not ruled out negligent design or other product defect, or that her own negligence caused her injury.

It appears Missouri courts have not decided whether a company that installs and exclusively maintains an elevator has control sufficient to satisfy *res ipsa*'s second requirement. Nonetheless, this Court concludes that it does. Based on the evidence that Schindler installed Elevator No. 8 and had the exclusive right and obligation to perform preventative maintenance, a reasonable jury could conclude that Schindler controlled the instrumentalities of Ms. Giesing's injury and therefore was the source of the negligence that caused her injury.

Schindler argues that because Ms. Giesing cannot exclude negligence by the manufacturer that created Elevator No. 8's component parts, she cannot successfully prove the second element of *res ipsa*. However, Ms. Giesing's burden is not so high. *See Hart v. Emery, Bird, Thayer Dry Goods Co.*, 118 S.W.2d 509, 511 (Mo. 1938) ("The mere possibility that some third person might have been responsible for the negligent condition of the instrumentality causing the injury does not prevent" res ipsa from applying); *Rosenberg v. Pritchard Services, Inc.*, 774 F.2d 293, 298

---

[7] Schindler disputes that it designed Elevator No. 8.

(8th Cir. 1985) ("Again, while a hypothetical stranger could have been in the area and could have set fire to the cart, to draw such an inference in light of the established facts would be to engage in the sort of speculation and conjecture the res ipsa rule itself is intended to prevent."); *see also Crystal Tire Co. v. Home Serv. Oil Co.*, 465 S.W.2d 531, 533 (Mo. 1971) (finding control element satisfied when one defendant, who was filling the truck with gas, had actual control over a gasoline truck when it exploded and another defendant had the right, as its owner, to control the truck). The "essential question" is whether the probable cause of an injury is one which the defendant was under a duty to the plaintiff to anticipate or guard against. *Foster v. City of Keyser*, 202 W. Va. 1, 17 (W. Va. 1997) (citing The Restatement of Torts 2d [1965] § 328D, comment g).

Here, it is undisputed that Schindler had the exclusive right—and obligation—to perform preventative maintenance and repairs on Elevator No. 8, including all its mechanical components, at the time Ms. Giesing was injured. From this fact alone, the jury could reasonably infer that the instrumentality was under Schindler's control. There is no evidence that St. Mary's played any role in the elevator's maintenance, beyond reporting concerns to Schindler. While there *could* have been latent manufacturing defects, Schindler—despite its exclusive access and control and superior knowledge—has furnished no evidence that there were. *See Hart*, 118 S.W.2d at 511 ("The theory of the doctrine is based, in part, upon the consideration that, as the management and the control of the agency producing the injury is exclusively vested in the defendant, plaintiff is not in a position to show the circumstances causing the agency producing the injury to operate, defendant possessing a superior knowledge of the facts." (emphasis omitted)). What's more, at the time of Ms. Giesing's injury, Elevator No. 8—and all its component parts—had been under Schindler's control for approximately five years, from the time St. Mary's opened to the time Ms. Giesing was injured. From these facts, a jury could reasonably conclude that Schindler, not the

14

manufacturer of any individual part, was more than likely responsible for any malfunction.[8] *See generally Am. Elevator Co. v. Briscoe*, 572 P.2d 534, 537 (Nev. 1977) (finding that passage of time paired with lack of evidence of a manufacturing defect was insufficient to defeat exclusive maintenance company's control over elevator).

This outcome is consistent with the law in many other jurisdictions. *Am. Elevator Co. v. Briscoe*, 93 Nev. at 669; Newell, 36 F.3d 576; *Montgomery Elevator Co. v. Gordon*, 619 P.2d 66, 70 (Colo. 1980); *Burgess v. Otis Elevator Co.*, 114 A.D.2d 784, 784 (N.Y. App. Div. 1985). Still, to support its position, Schindler points primarily to *Bronz v. St. Jude's Hosp. Clinic*, which found an elevator maintenance company did not have control to satisfy *res ipsa* when another company installed and manufactured the elevator. 402 S.E.2d 263, 268 (W. Va. 1991). However, even accepting that *Bronz* would have supported Schindler's position, the West Virginia Supreme Court modified *Bronz's* holding on the control requirement just six years later in *Foster v. City of Keyser*. 202 W. Va. 1, 20 (1997). The *Foster* court concluded that its earlier holdings—including *Bronz*—took too literal and strict of an approach on the control element of *res ipsa*, and adopted the Restatement approach, which it stated would "ordinarily provide a fairer, broader, and more generally applicable and useful formulation of the rule[.]" *Id*.

Rejecting the specificity Schindler seeks is also consistent with Missouri case law. For example, in *Eversole v. Woods Acquisition, Inc.*, the court found that the defendant, a mechanic who worked on the plaintiff's car, had control for *res ipsa* purposes over the car's fuel lines—which leaked and caused a fire—even though the defendant did not make any repairs to the fuel lines themselves because the defendant had to remove, set aside, and reconnect the fuel lines to

---

[8] Indeed, while he also opined that Ms. Giesing was in the "Dead Zone," Schindler's own expert rejected the possibility of a product defect out of hand. *See* Doc. 35-5, 60:25–61:2.

make the repairs for which it was hired. 135 S.W.3d 425, 429 (Mo. Ct. App. 2004). The court found that the jury could reasonably conclude that the defendant's work reattaching the fuel lines gave it the requisite control. The fact that there were potentially other causes, including negligence by the car's manufacturer or the plaintiff, seems to have played no role in the court's analysis. Similarly, in *Weaks* and *Niman*, *res ipsa* applied to the plaintiffs' claims against their landlords because the landlords retained control over the heating systems in their tenants' apartments. The landlords owned the heating systems and were responsible for repairs for all portions of the heating mechanism, and the plaintiffs had no interest in the heating system other than to report defective conditions to the landlord. The *Weaks* court concluded, relying on the Missouri Supreme Court in *Niman*, that because "the defendants had sole and exclusive control of the entire heating system and particularly that portion which ruptured and caused the damage suffered," the plaintiff's case was properly submitted under the *res ipsa loquitur* theory. *Weaks v. Rupp*, 966 S.W.2d 387, 395 (Mo. Ct. App. 1998); *Niman v. Plaza House*, 471 S.W.2d 207, 209–10 (Mo. banc 1971).

These cases are analogous. Schindler installed, and had an exclusive contract to maintain and repair, Elevator No. 8. Ms. Giesing had no interest in the elevator, beyond using it to travel between floors at St. Mary's. Nor is there any evidence that St. Mary's played any role in servicing the elevator or conducting preventative maintenance. Accordingly, a reasonable jury could conclude that Schindler had control of Elevator No. 8.

Separately, none of the cases cited by Schindler suggest that the Court should take Ms. Giesing's actions into account on these facts when analyzing control. While it is true that a plaintiff could have management or control over the instrumentality that caused her injury, for example, in cases in which a plaintiff is operating machinery or a vehicle that ultimately causes injury, there is no evidence that Ms. Giesing here had any control over—or even access to—the mechanical

components that affect Elevator No. 8's doors. Indeed, Schindler does not argue that she had such control. Rather, Schindler argues that Ms. Giesing caused her own injury by failing to realize that she was in the elevator's "Dead Zone." Schindler's argument goes to causation, not the control element of *res ipsa loquitor*.

In short, the Court concludes that Ms. Giesing has presented enough facts to establish the second element of *res ipsa*. Accordingly, Schindler's Motion for Summary Judgement on this point is DENIED.

### D. Whether Schindler Has Superior Knowledge About the Cause of the Incident

The third element required to establish the applicability of *res ipsa* is that the defendant must possess superior knowledge or means of acquiring information as to the cause of the plaintiff's injury. This element is meant to acknowledge that a *res ipsa* "plaintiff is not in a position to show the particular circumstances which caused the injuries while defendant, having the management and control of the instrumentalities involved, should possess the information essential to establishing the cause of the accident." *Venditti v. St. Louis Pub. Serv. Co.*, 226 S.W.2d 599, 601 (Mo. 1950). Thus, "Missouri courts often infer the 'superior knowledge' element . . . from the defendant's control over the instrumentality at issue." *Weaks*, 966 S.W.2d at 395.

Ms. Giesing has introduced evidence showing that Schindler has superior knowledge and access to information about the cause of her injury. Given that Missouri law is clear that if a plaintiff has shown control, superior knowledge can be inferred, and, as discussed above, a reasonable jury could conclude that Schindler controlled Elevator No. 8, there is sufficient evidence to establish Schindler's superior knowledge. *See Niman v. Plaza House*, 471 S.W.2d 207, 210 (Mo. banc 1971) (inferring superior knowledge of cause of defective pipes in heating system from landlord's exclusive control over heating system in apartment building); *McDowell*

*v. Sw. Bell Tel. Co.*, 546 S.W.2d 160, 170 (Mo. Ct. App. 1976) (holding telephone company liable for damages caused by a loud noise emitted by telephone because telephone company possesses superior knowledge or means of acquiring superior knowledge of cause of occurrence).

Schindler argues that superior knowledge cannot be inferred here because it did not control Elevator No. 8. While Schindler is free to present that argument at trial, as discussed above, the record does not compel such a conclusion.

Schindler further argues that its knowledge was attenuated by time; the last time it inspected the elevator was eight months prior to Ms. Giesing's injury. In support of this argument, Schindler cites *Gibbs v. Gen. Motors Corp*. There, a plaintiff purchased a vehicle from the defendant, only to crash two months later because of what the plaintiff claimed was a faulty brake pedal. 166 S.W.2d 575, 576 (Mo. 1942). The plaintiff argued that the defendant car manufacturer and dealer were in control and had superior knowledge because the plaintiff purchased the car only several months prior to the accident and the car had been serviced only by the defendants in that time. *Id.* at 576. The Missouri Supreme Court rejected that argument, finding instead that the passage of time and the inability of the defendant to access and control the car defeated the control requirement of *res ipsa*. *Id.* at 581.

The facts of *Gibbs* are distinguishable for several reasons. The plaintiff in *Gibbs* drove the car when the brake pedal purportedly failed, and neither of the defendants had any obligation (or ability) to affirmatively inspect or maintain the plaintiff's car, outside of the maintenance the plaintiff requested. Here, in contrast, Schindler always had the right to access Elevator No. 8, and had an obligation, per its contract, to perform preventative maintenance and to make any necessary repairs required to keep it in a safe operating condition. The fact that Schindler chose to do these things only once a year does not diminish its superior access or control.

As the party that installed and was exclusively responsible for the maintenance and repairs of Elevator No. 8, Schindler had, and has, far superior access to the elevator and its components, and therefore possesses far more knowledge about the cause of Ms. Giesing's injury, which undisputedly was caused by the elevator doors' closing. No party is better situated to speak to Elevator No. 8's functionality on the date of Ms. Giesing's injury than Schindler. Accordingly, Schindler's Motion on this point is DENIED.

## IV.  CONCLUSION

For the reasons discussed above, Schindler's Motion for Summary Judgment, Doc. 32, is DENIED.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated:  09/02/2022  
Jefferson City, Missouri